```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                                     21 Cr. 409 (CM)

FREEDOM TURNER,

                    Defendant.
------------------------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/21

### DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

McMahon, J.:

Defendant Turner is charged with being a felon in possession of firearms, in violation of Title 18, United States Code, Sections 922(g)(1), 924(a)(2), and 2.

Before the Court is defendant's motion to suppress (i) two firearms that were seized from his apartment during a parole search and (ii) his post-arrest statement admitting to possessing the firearms. The premise of defendant's motion is that "the NYPD exploited Turner's status as a parolee, unofficially deputizing New York State parole to gain—on NYPD's behalf—unfettered access to Turner's apartment without a warrant. This search was not a good-faith exercise of New York parole's authority to search Turner as a parolee. Instead, it was a calculated and orchestrated effort by the NYPD to conduct a warrantless search for the sake of the state's general interest in law enforcement." Defendant's Reply, ECF Doc 14, at 1. Defendant asks that the weapons recovered and the statements he subsequently made be suppressed. *Id.*

The Government opposes the motion arguing *inter alia* that there was no such subverting of the warrant requirement. Government Opposition, ECF Doc. 12.

1

*Parole Searches*

Under New York State law, the determination as to whether a warrantless parole search "was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *People v. Huntley,* 43 N.Y.2d 175, 181 (1977). Under federal law, as established by the Second Circuit:

> the New York rule [articulated in *Huntley* ] is coextensive with the requirements of the Fourth Amendment. A rule indicating that a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties is identical to a rule that parole officers may conduct searches so long as they comport with the Fourth Amendment. This is because the doctrine of "special needs" permits those searches that are reasonably related to the special needs animated by management of a parole system.

*United States v. Grimes,* 225 F.3d 254, 259 n. 4 (internal citation omitted) (citing *Chandler v. Miller,* 520 U.S. 305, 313–14 (1997)). Proper management of a parole system includes a mandate to investigate whether a parolee is violating the conditions of his parole, one of which is that the parolee commit no further crimes. *United States v. Barner,* 666 F.3d 79, 85 (2d Cir. 2012). And the Supreme Court has held that suspicionless searches of parolees comports with the Fourth Amendment—at least so long as the searches were not conducted for arbitrary, capricious, or harassing reasons. *Samson v. California,* 547 U.S. 843, 847 (2006).

*Defendant was on Parole at the Time of His Arrest*

As a threshold matter, Turner was indisputably on parole at the time of the challenged search.

From at least in or about June 2017, until on or about September 17, 2019, the defendant was in the custody of the New York State Department of Corrections and Community Supervisions ("DOCCS"), serving prison time following convictions for second-degree criminal possession of a weapon and second-degree assault. (Turner's Parole Records, Government Opposition, ECF Doc. 12., Exhibit 1. On or about September 17, 2019, the defendant was released from custody to parole supervision. *Id.* As a parolee, under New York law, the defendant was subject to a number of conditions of release. Those conditions included that he would "permit his parole officer to visit him at his residence" and would "permit the search and inspection of his person, residence and property." 9 N.Y.R.R. § 8003.2.

Prior to his release from prison, the defendant signed a form titled "Certificate of Release to Parole Supervision," which informed him what being on parole would entail. Ex. 1. In the form, the defendant attested that he understood that he would be subject to "Community Supervision," and "fully underst[ood] that my person, residence and property are subject to search and inspection." *Id.* The defendant also attested that he understood that "Parole Supervision is defined by [certain] Conditions of Release and all other conditions that may be imposed upon me by the Board of Parole or an authorized representative of the Department of Corrections and Community Supervision." *Id.* The form then went on to list the "Conditions of Release" that define parole supervision. Most pertinently, condition four stated: "I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property." *Id.* Condition eight stated: "I will not behave in such a manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of others." *Id.*

3

And condition nine stated, in pertinent part: "I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer." *Id.* At the time of his release, the defendant's term of parole supervision was set to run until September 17, 2022, and that date was listed on the Certificate of Release form. *Id.*

*The Facts Surrounding the Search as Detailed in the Sworn Complaint*

According to the criminal complaint, sworn to before Magistrate Judge Cave: Turner's parole officer (Parole Officer-1) received information from an officer with the N.Y.P.D. that Turner was pictured in various internet videos showing Turner and others rapping and discussing firearms, shootings, and other violence. One of the Videos appeared to show Turner holding a firearm. Based on the Videos, Parole Officer-1 decided to conduct a home visit and safety search of Turner's residence.

On the morning of February 12, 2021, Parole Officer-1 and approximately eight to ten other parole officers prepared for a home visit of the Apartment.   During the home visit, members of the NYPD would wait outside the residence while the parole officers entered and conducted the search. At or around 6:30 a.m., the parole Officers and NYPD officers arrived at the Apartment. Turner was present at the Apartment with his cousin and his cousin's young children. Turner was handcuffed for officer safety and members of the NYPD waited outside the Apartment while the parole officers conducted the visit and search.

The Apartment is a "railroad style" apartment, which means that an individual must walk through one of the Apartment's two bedrooms to get to the other.   After speaking with Turner, Parole Officer-1 learned that Turner's bedroom ("Bedroom-1") was at the rear of the apartment and that his cousin's bedroom ("Bedroom-2") was the bedroom immediately in front of Turner's

4

bedroom. The Parole Officers searched Bedroom-1 while Turner sat on the bed. After searching Bedroom-1, Turner stated that he kept some of his shoes in Bedroom-2. The parole officers then began to search Bedroom-2 and noticed what appeared to be a firearm inside of an open bag. As the officers noticed one firearm, Turner began stating, in sum and substance, that there were multiple firearms in Bedroom-2, that the firearms belonged to Turner, and that one of the firearms did not work. During the search of Bedroom-2, the parole officers found two firearms and alerted members of the NYPD who then entered the Apartment to take custody of the firearms and arrest Turner.

Defendant gave a statement after receiving Miranda warnings and said, in sum and substance, that both of the firearms found inside the Apartment were his. Complaint, ECF Doc 1.

*The Cousin's Affirmation*

Turner did not file an affirmation in support of his motion; instead, his cousin, James Leonard, filed an affirmation on his behalf. Mr. Leonard affirms, *inter alia*, that:

> 2. On February 12, 2021, Mr. Turner and I lived together with my family at an apartment located at 924 E 215th Street, Bronx, NY 10469. Mr. Turner had full access to the apartment and had his own bedroom, which was connected to my bedroom by a door. You have to pass through my bedroom to get to Mr. Turner's bedroom.
>
> 3. I invited Mr. Turner to live with me and my family upon his release on parole. Mr. Turner gets along well with my children and I never had any issues or concerns with Mr. Turner.
>
> 4. Early in the morning of February 12, 2021, at around 6:00 a.m., I heard a knock on my apartment door and went to answer

5

it. I looked through the peephole and saw a bunch of people. I asked who they were, and they responded "Parole" and explained that they were looking for Mr. Turner. I woke Mr. Turner up, and he went to the door and opened it.

5. As soon as Mr. Turner opened the door, about 10 parole officers entered the apartment. The officers immediately handcuffed Mr. Turner and took him into our adjoining bedrooms. Some of the officers stayed back in the kitchen with my family and me.

6. At some point, I heard one of the officers in the bedroom with Mr. Turner yell, "gun." At this time, one of the parole officers handcuffed me.

7. Less than a minute later, the apartment was flooded by NYPD uniformed officers. I believe the NYPD officers were downstairs waiting the whole time.

8. When the NYPD officers entered the apartment, one of the parole officers un-handcuffed me, and an NYPD officer then put his handcuffs on me. Shortly thereafter, I was taken out of the apartment along with Mr. Turner. We were both in NYPD custody.

9. Mr. Turner and I were driven to the 47th Precinct. There I was interrogated and asked about my alleged connection to the Crips. To be clear, I do not have any affiliation whatsoever with any street gangs.

10. After the interrogation at the 47th Precinct concluded, Mr. Turner and I were taken by NYPD officers to the 42nd Precinct. Upon arriving there, I heard one of the NYPD officers already at the precinct call Mr. Turner "A-1," which I know to be Mr. Turner's rap name. I also heard one of the NYPD officers at the 42nd Precinct tell Mr. Turner, "You were fast, but not fast enough."

11. I was later charged in state court with possession of a firearm, but the charges were eventually dismissed.

*Defendant's Motion*

Defendant claims that what really was going on here was that Officer

Alvino of the NYPD was investigating crimes committed by the alleged criminal enterprise known as "Untouchable Gorilla Stone Nation" and its affiliates, including the "Gorilla Stone Bloods." *See* Defendant's Motion at 2 and Ex. B (U.S. Attorney's Office for the Southern District of New York press release detailing the indictment of 18 members of an alleged criminal enterprise known as the "Untouchable Gorilla Stone Nation."), ECF Doc 12-2; Ex. C (Notes of Interview with NYPD Officer Alvino), ECF Doc. 12-3 . After learning about Turner's alleged affiliation with the group and seeing a rap video online where Turner referred to guns and homicide, Officer Alvino contacted Turner's parole officers to help NYPD facilitate a search of Turner's residence instead of seeking out a warrant to conduct a search. Defendant surmises that Officer Alvino knew that the video of Turner with what appeared to be a gun would not be enough for a judge to issue a warrant, so he circumvented the warrant requirement by deputizing parole to act on its behalf. Defendant's Reply at 1-2, ECF Doc. 12.

Even if, as the defendant alleges, the NYPD Officers investigating gang violence did not have reasonable suspicion to obtain a search warrant for defendant's apartment (an issue this court need not decide), Parole had the authority to search defendant's apartment without a warrant. There is no need to look further than the facts of *United States v. Braggs*, 5 F.4th 183 (2d Cir. 2021).

In *Braggs*, parole officers executed a search of the defendant's house after the New York State Department of Corrections and Community Supervision

7

received an anonymous tip that the defendant might have had guns in his home. The district court concluded that the officers lacked reasonable suspicion to search based on the tip and suppressed the three firearms, loaded magazine, box of ammunition, drugs and drug paraphernalia, and cash found in the residence, as well as the statements the defendant made in connection with the search. The Second Circuit reversed and held that the district court erred in holding that reasonable suspicion was required in the context of those facts. Indeed, "[o]nce Officer Bailey received notice of an anonymous tip suggesting that Braggs had guns in his possession—a clear violation of his parole conditions—he and his team were constitutionally permitted to search the house to determine whether Braggs was complying with the relevant condition." *Braggs*, 5 F.4th at 188. "Because a search undertaken by a parole officer of a parolee to detect parole violations is 'reasonably related to the parole officer's duties,'" such search is 'permissible' under the Special Needs framework and accordingly 'comport[s] with the Fourth Amendment.'" *Id.*

This is not to say that *any* parole search is permissible. If, for example, a parole officer conducted a search for a personal reason—such as to retaliate against a parolee for a perceived slight— that action would not be "rationally and reasonably related" to his duties (and likewise would be "arbitrary, capricious, or harassing," *Samson*, 547 U.S. at 847. Far from arbitrary, capricious, or harassing, here the decision to search defendant's apartment was made by Parole

8

Officer-1 and the officer's superiors after viewing a video showing their parolee brandishing a gun—as egregious a parole violation a parolee might commit. Even if, as defendant suggests, Officer Alvino's personal motive was to have Parole do his bidding, it was ultimately Parole that decided to search defendant's apartment. Indeed, after viewing the video of its parolee with a gun in his hand, Parole would have been derelict in its duty if it failed to search defendant's apartment.

The fact that Parole coordinated with NYPD officers and NYPD officers were waiting in the wings to assist the Parole officers does not vitiate the lawfulness of the search by Parole. *See United States v. Lambus*, 897 F.3d 368, 409 (2d Cir. 2018) (quoting *United States v. Newton*, 369 F.3d 659, 662 (2d Cir. 2004) (the Second Circuit "ha[s] squarely rejected the 'argument that police assistance during an otherwise reasonable warrantless search by parole officers thereby invalidates the search.'"

As for defendant's statements, his first admission that the firearms were his and that one was inoperable were spontaneous utterances. According to Officer-1, the defendant made the statements as the parole officers located the firearms. Nothing in the defendant's cousin's affidavit is "sufficiently definite, specific, detailed, and nonconjectural" to show that the defendant's statement was in response to an interrogation or its functional equivalent. *United States v. Bazemore*, No. 20 Cr. 573 (ER), 2021 WL 1719233 at *6 (S.D.N.Y. Apr. 30, 2021). The defendant alleges no defect in the process whereby officers read, and he

9

waived, his *Miranda* rights. And the exclusionary rule does not apply here because the defendant's statements were not the result of an unconstitutional search by the parole officers.

Accordingly, there is no need to conduct a hearing. Defendant's motion to suppress is denied in its entirety.

This constitutes the decision and order of the Court.

December 20, 2021

_____
District Court Judge

BY ECF TO ALL COUNSEL

10