**Federal Defenders
OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 9, 2022

**BY EMAIL & ECF**
Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:   <u>United States v. Freedom Turner,</u>
           21 Cr. 409 (CM)

Dear Judge McMahon:

      The Court should sentence Freedom Turner to time served, followed by three years' supervised release. Having been in custody since his arrest in February 2021, Mr. Turner has effectively completed a substantial sentence of nearly 20 months' imprisonment, four months of which were spent on Rikers Island (from February 2021 through June 2021) and another six months in the special housing unit of MDC Brooklyn. Crucially, although Mr. Turner's six months in "the box" at MDC were purportedly attributable to alleged disciplinary infractions, as noted in the final Pre-Sentence Report (PSR), Mr. Turner has never incurred a single infraction at MDC. PSR at ¶6. Instead, he was left to languish in the SHU for nearly half a year over unspecified disciplinary allegations that never materialized. This transformed Mr. Turner's pre-trial detention into a de facto punitive sentence.

      But beyond Mr. Turner's extraordinarily harsh pre-trial confinement conditions, which included numerous COVID-related lockdowns, restrictions on visiting and programming, obstructions to his access to medical care, and Mr. Turner's own COVID-19 infection, there are ample other grounds for a downward variance from the Guidelines range of 70 to 87 months calculated by Probation, (based on a criminal history category of V and an adjusted offense level of 21) or from the Government's stipulated Guidelines range of 51 to 71 months' imprisonment as set forth in its Pimentel letter.[1]

---

[1] Although Mr. Turner pleaded guilty to the lone §922(g) count in the indictment without a plea agreement, he did receive a Pimentel letter from the Government, which reflected a criminal history category of IV and an adjusted offense level of 21, <u>i.e.</u>, a range of 51 to 71 months' imprisonment. PSR at ¶4.

<u>First</u>, Mr. Turner's personal circumstances weigh in favor of a downward variance to time-served. The numerous letters of support appended to this submission illustrate the love and warmth available to Mr. Turner from his friends and family, who clearly value him and want to help him live a productive, successful, and fulfilling life. The letters also help explain how Mr. Turner's life took a wrong turn after his mother's tragic and devastating passing, and how Mr. Turner has clearly failed to overcome the anger and pain he carries as a result of his mother's death. Mr. Turner's friends and family provide reassurance that with the right community supervision, mental health treatment, and institutional support, Mr. Turner has the tools and family commitment to turn his life around and avoid any future interaction with the criminal justice system.

<u>Second</u>, The circumstances surrounding Mr. Turner's offense militate against a guidelines sentence. As reflected in Mr. Turner's motion to suppress, the firearms at issue were discovered when officers from New York State parole searched a bedroom space that Mr. Turner shared with his cousin, the leaseholder of the apartment. Mr. Turner immediately accepted responsibility for the firearms (one of which was broken and unusable) and was emotional, crying as the officers led him and his cousin away in handcuffs. There is no indication Mr. Turner used, brandished, discharged, lent, or otherwise removed from the house the firearms at issue.

<u>Third</u>, Mr. Turner's guidelines range (whether it is the one calculated by the Government in its Pimentel letter or the one calculated by Probation in the PSR) is tethered to the application of an enhancement under §2K2.1(a)(4)(A) that establishes a base offense level of 20 (as opposed to 14 under §2K2.1(a)(6)) based on a determination that Mr. Turner's prior New York State second-degree assault conviction under NYPL §120.05 categorically satisfies the Guidelines' definition of a "crime of violence." But not every variant of NYPL §120.05, which the defense acknowledges is divisible along its subsections, categorically qualifies as a "crime of violence," and the description of the prior offense in the PSR is insufficient to determine whether Mr. Turner pleaded guilty to a qualifying subsection. <u>See generally</u> <u>United States v. Peña</u>, 762 F. App'x 34, 37-38 (2d Cir. 2019) ("The PSR, by its own terms, purports to describe only how Peña was <u>initially charged</u>, not the subsection to which he ultimately <u>pleaded guilty</u>.") (emphasis in original).

Because nothing else in the record supports a determination that Mr. Turner pleaded guilty to a subsection of NYPL §120.05 that is categorically a crime of violence, his adjusted offense level should be 15, not 21, with a corresponding guidelines range of 30 to 37 months (Criminal History Category IV) or 37 to 46 months (Criminal History Category V).

2

<u>Fourth</u>, despite the extreme difficulties Mr. Turner has encountered over the past 20 months, he has endeavored to make the most of his time at MDC, completing a number of modules and courses through the psychology department while he was in the SHU. Exhibit A. Mr. Turner's statement to the Court also reflects his optimism for the future and genuine remorse for his poor decision-making. Exhibit B. And his reentry plan, which he wrote with the assistance of a social work intern from the Federal Defenders, proves that he is not taking his return to society lightly. Exhibit C. Mr. Turner is prepared to work hard with the assistance of his probation officer to overcome this most recent setback and be the kind of father, son, and brother that he and his family deserve.

1. **Mr. Turner's struggles with the law and self-destructive behavior are rooted in unresolved grief and anger over his mother's death, and overcoming that pain is critical to his successful reentry.**

Freedom Turner was born on September 26, 1997 in the Bronx to Tyrone Turner and Margaret Leonard. Tyrone Turner is a maintenance worker and Margaret Leonard was a retail sales associate before she succumbed to lung cancer in 2014. Mr. Turner was very close with his mother and was devastated by her passing. As his older sister Maureen Leonard writes:

> My mom's passing took a toll on him and still affects him to this day. He was always a good kid, but after our mom died, he was hanging out in the streets more, not listening to my dad enough, and coming home whenever he felt like it. He was really close to our mom – he was always attached to her. There are still days when he really needs his mother, or when he really wants to sit and talk to his mom, but he can't. I don't think he was able to process her passing; he talked to me and my brother about it, but he didn't have anyone else to go to.

Exhibit D, letter from Maureen Leonard.

Indeed, before his mother died, Mr. Turner "grew up with two parents in the household. He went to a decent school and hung out with people in the neighborhood." Exhibit E, Letter from Ellisha Leonard. But at around 11 or 12 years old, Mr. Turner's parents split up as a result of his father's infidelity. Shortly thereafter, Margaret Leonard was diagnosed with Stage 5 lung cancer and given a short time to live. The youngest of all of Margaret's children, Mr. Turner was devastated. According to Gregory Leonard, Mr. Turner's older brother:

> She had always been the glue which kept together the order and structure we knew at home. This pain we witnessed our mother endure

3

> through those last few years battling cancer and then the loss of our mother caused much distress in all our lives, but I believe it affected Freedom's life most significantly because he was the youngest of all her children. We all went through dark times for a long while, and made choices and decisions out of impulses that I don't believe any of us would have normally made. I believe my mother passing away was the main reason Freedom began to act out. He's always been a quiet person, but after we lost her, he didn't talk to anyone, especially about the things he was feeling and experiencing.

Ex. F, Letter from Gregory Leonard. It was not long after Margaret died that Mr. Turner "turned to the streets." As Ellisha Leonard writes:

> He seemed very angry and short-tempered. A lot of Freedom's frustration was definitely because of his father. He had cheated on my mom and caused them to split up, so that put even more of a strain on his relationship with Freedom. I tried to keep Freedom involved in all the family functions, but Freedom was mostly left to fend for himself. He had to deal with the loss on his own, which was especially hard at that age because he had no idea how to cope with that.

Ex. E.

Mr. Turner's criminal record, which includes three convictions from 2015 through 2017 (PSR at ¶30-32), is proof of the tumult and anger he experienced after his mother died. Having never been in trouble with the law before his mother passed, Mr. Turner clearly spun out of control quickly, picking up three separate cases in less than three years—an incredibly sad and abrupt turn of events. Had there been an intervention at that critical moment, had Mr. Turner been able to avail himself of counseling or therapy to cope with losing his mother, there is a strong likelihood Mr. Turner would not be in jail today.

Of course, identifying the connection between Mr. Turner's prior convictions and the loss of his mother is not to excuse or justify Mr. Turner's conduct. But it is necessary to understand how, after a decent, middle-class upbringing in a stable home insulated from the streets, Mr. Turner suddenly found himself right in the middle of trouble. Fortunately, Mr. Turner is still young enough and surrounded by enough love and support from his family that this case can be the intervention he needs to piece his life back together—especially for the sake of his young son. As Gregory Leonard writes:

> Freedom was locked up pretty soon after his son was born and even when he was out, his son lived out of state. However, Freedom and his son's mother made a lot of efforts to meet up and ensure that Freedom was actively in his son's life – not just talking to him, but also seeing each other in person. Freedom was trying to make the right decisions so he could put himself in a better position to take care of his family, especially his son. Growing up in a household with his father present, he's seen how a father should be there for a child and what a good example of a father looks like. Freedom's son is a huge motivator for him to be better in the future – I think that drives him more than anything else.
>
> We want to get Freedom home as soon as possible so he can re-establish himself in the workforce, get back to his newborn baby and family, and continue creating great music. I've never been locked up, but I've heard all types of horrible stories about his time in jail. The sooner Freedom comes home, the sooner we can get back to ensuring that Freedom is doing all the things he needs to do to be better.

Ex. F.

For his part, Mr. Turner does have insight into the connection between his mother's death and his emotional dysregulation. In his own words to the Court:

> May 18th, 2014, my mother passed away. It was also the birthday of my older brother, Gregory. This was the worst day of my life. It was a complete shock. I loved my mother so much. She was my whole world. I found my mother dead. I was 16 years old, and I saw my mother die. After that day, I began to lose interest in everything. I struggled so much with the grief I held over the death of my mother. On June 8th, 2015, I ended up at Rikers Island. I wouldn't return home until September 17th, 2019.

Ex. B.

### 2. The specifics of Mr. Turner's offense do not justify the Court's imposition of an additional term of imprisonment.

As the Court is aware from Mr. Turner's suppression motion, he is an aspiring hip-hop artist who makes songs and music videos, and he landed on the NYPD's social media radar after a video surfaced of him performing a song while holding what appeared to be a gun in his hand. An NYPD officer shared the video

5

with Mr. Turner's parole officer through the Department of Corrections and Community Supervision (DOCCS) and they agreed to conduct a search of Mr. Turner's apartment.

During the early morning hours of February 12, 2021, DOCCS and NYPD officers arrived at Mr. Turner's apartment unannounced. Upon answering the door, Mr. Turner was immediately handcuffed, and his cousin (who was responsible for the apartment) was forced to sit and wait in the living room. The officers who handcuffed Mr. Turner took him to his bedroom and they eventually found two firearms, one of which was broken. Mr. Turner cried as he immediately acknowledged having the weapons and of putting them in his cousin's space. Nevertheless, both Mr. Turner and his cousin were arrested, and the charges were not dropped against Mr. Turner's cousin until some time later.

The facts of this case do not weigh in favor of a substantial additional term of imprisonment. Not only was one of the guns broken and unusable, but both weapons were recovered from inside Mr. Turner's cousin's apartment, where Mr. Turner was living, tucked away in a space accessible by Mr. Turner and his cousin. Mr. Turner immediately confessed to the guns being his and he took responsibility for putting the guns there, expressing genuine distress that his actions had also caused his cousin to be unfairly arrested. Against this backdrop, the most aggravating aspects of Mr. Turner's case are the essential elements of the offense: that he possessed a firearm as a prohibited person knowing that he was a prohibited person and not permitted to possess a gun. There is no indication either gun was used, brandished, discharged or displayed in connection with any other crime. Mr. Turner knows he should not have had the guns and is sincerely remorseful, as he writes to the Court:

> I want to continue to better myself as well as become a better father to my son. I am hurt and ashamed every night that I cannot help put him to sleep. The truth is that I'm being sentenced to a federal offense 17 months after I come home from my state sentence. To be honest, I feel pathetic, ashamed, I let my family down. I'm the only one to blame for my current situation. I'm not a kid and I take full responsibility for my actions. The plain truth is that I was moving reckless, and that behavior isn't acceptable. I am thankful that my reckless behavior didn't result in anyone getting physically hurt, though I understand it could have.

Ex. B.

3. **The guidelines range calculated in the PSR lacks support in the record because it is based on a barebones assertion that Mr. Turner's prior conviction for New York second-degree assault categorically qualifies as a predicate "crime of violence" for the purposes of establishing a base offense level of 20 under §2K2.1(a)(4)(A).**

According to Probation, Mr. Turner's base offense level under the Guidelines is 20 pursuant to §2K2.1(a)(4)(A) because he committed the offense "subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." PSR at ¶19. The defense submits that the only one of Mr. Turner's prior convictions that could qualify as a crime of violence is his conviction for second-degree assault under NYPL §120.05. PSR at ¶31. Of course, some subsections of NYPL 120.05 categorically match the definition of a crime of violence set forth at §4B1.2(a)(1). See, e.g., United States v. Tabb, 949 F.3d 81, 84 (2d Cir. 2020) ("[W]e find that the substantive crime of second degree assault under N.Y.P.L. §120.05(2) 'has as an element the use, attempted use or threatened use of physical force against the person of another' and is categorically a crime of violence under U.S.S.G. §4B1.2)). However, not all of the subsections do, and there is insufficient evidence in the present record to establish that Mr. Turner was convicted under a qualifying subsection.

As is relevant here, the Guidelines define a "crime of violence" as any offense punishable by imprisonment for a term exceeding one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another." §4B1.2(a)(1). To determine whether a state crime falls under the Sentencing Guidelines, the Second Circuit generally uses the "categorical approach" prescribed by the Supreme Court. Taylor v. United States, 495 U.S. 575, 600 (1990). Under this abstract approach, a court considers the "generic, contemporary meaning" of the crime in the guidelines, id. at 598, and then determines whether the crime committed by the defendant falls under this "generic offense." The Court "ignores the circumstances of the particular defendant's crime and asks instead what is the minimum criminal conduct necessary to sustain a conviction under the relevant statute." Singh v. Barr, 939 F.3d 457, 462 (2d Cir. 2019) (internal quotation marks and citation omitted). "[O]nly if the statute's elements are the same as, or narrower than, those of the generic offense does the prior conviction serve as a predicate offense for a sentencing enhancement." United States v. Castillo, 896 F.3d 141, 149-50 (2d Cir. 2018) (internal quotation marks and citation omitted).

The defense does not dispute that NYPL §120.05 is divisible along its various subsections because it "sets out one or more elements of the offense in the alternative." Descamps v. United States, 570 U.S. 254, 257 (2014). Therefore, the

7

Court must engage in the "modified categorical approach." Peña, 762 F. App'x at 37. When applying the modified categorical approach, a district court may consult a circumscribed set of documents relating to the defendant's prior conviction in order to ascertain whether his guilty plea "necessarily admitted facts demonstrating that his conviction was for a crime of violence." United States v. Reyes, 691 F.3d 453, 458 (2d Cir. 2012) (internal quotation marks and brackets omitted). The district court's inquiry is "limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." Shepard v. United States, 544 U.S. 13, 26 (2005).

In this case, the defense is unaware of any so-called "Shepard" documents in the record that specify the subsection of NYPL §120.05 to which Mr. Turner pled guilty. Rather, all the Court has is the PSR, which is clearly not a Shepard-approved document. See Peña, 762 F. App'x at 37. As the Second Circuit addressed in Peña, after acknowledging that, while NYPL §120.05(2) qualifies as a crime of violence, "other subsections [] may not be crimes of violence":

> Peña's PSR cannot serve as the exclusive basis for the District Court's "crime of violence" determination. The PSR, by its own terms, purports to describe only how Peña was initially charged, not the subsection to which he ultimately pleaded guilty. Nothing else in the record supports the District Court's conclusion that Peña pleaded guilty to a subsection that is categorically a crime of violence. Accordingly, the District Court plainly erred in applying a career offender enhancement based on Peña's N.Y.P.L.§120.05 conviction, pursuant to the modified categorical approach, in the absence of any Shepard-approved documents.

Peña, F. App'x at 37-38. Accordingly, if the Government or Probation requests at sentencing for the Court to calculate Mr. Turner's guidelines through an application of §2K2.1(a)(4)(A), either party must submit materials consistent with Shepard to demonstrate that Mr. Turner's prior assault conviction is a crime of violence. For now, Mr. Turner submits that his base offense level is 14 under §2K2.1(a)(6). With a four-level enhancement for possessing a firearm with a defaced serial number (PSR at ¶20; §2K2.1(b)(4)(B)), and a three-level reduction for acceptance of responsibility, the defense avers that Mr. Turner's adjusted offense level is 15, resulting in a range of 30 to 37 months imprisonment (Criminal History Score of IV) or 37 to 46 months' imprisonment (Criminal History Score of V). Given the

variability in how the Guidelines' could apply to Mr. Turner's record, Probation's recommended sentence of 70 months' imprisonment—based almost exclusively on its Guidelines calculation—misses the mark and is greater than necessary to punish Mr. Turner and promote respect for the law, particularly given the totality of his circumstances.

4. **Despite a terrifying, lonely, and spirit-crushing 20 months' imprisonment, on both Rikers Island and MDC, Mr. Turner and his family are excited to be reunited and to work together to finally help Mr. Turner realize his potential.**

As noted above, Mr. Turner spent about four months on Rikers Island following his arrest in February 2021 before he was taken into federal custody and sent to MDC Brooklyn in June 2021. And while he was at MDC, Mr. Turner inexplicably spent nearly six months in the special housing unit, even though he has no disciplinary infractions or tickets at MDC to his name. PSR at ¶6.

Before he was thrown in the SHU, Mr. Turner and Emma Famili, a Federal Defender social work intern, worked hard together on a reentry plan, attached to this letter as Exhibit __. The plan, while not perfect, provides a useful blueprint for Mr. Turner's reentry, a document to which he can hold himself accountable and use to set goals and better work with his probation officer. Mr. Turner's family is also eager to welcome him home, and they will undoubtedly be a key source of support and stability. According to Maureen Leonard:

> Freedom is away, and I know it has given him some time to think about turning his life around. He wants to come home, do better, and be more committed to certain aspects in his life. I know he wants to find a job, and my dad is getting a place for them to live either in New Jersey or in Yonkers. The first thing Freedom wants is to see his two-year-old son and spend time with him, because I know he misses him. Freedom misses the rest of his family, too, because we were always around each other. When he was out, I used to talk to Freedom almost every day to check up on him and make sure he's good, and he would do the same for me. We would make sure we each had money in our pockets and would say, "don't be hesitant to ask if needed." Now I don't hear from my brother and I always want to make sure he's good, but I can't talk to him as much. Freedom can always come to me for anything he needs. I'm there for Freedom one hundred percent.

Ex. D.

9

James Leonard, Mr. Turner's cousin, offers a similar positive outlook on Mr. Turner's return home and overall prognosis, writing:

> A lot changed after he got arrested. Freedom always helped me out and was like my little brother. It's hard not having him here to help me out with the kids. I haven't even been able to talk to him since he's been incarcerated. I know his kid comes up to visit from Atlanta.
>
> I think Freedom wants to be more involved in his kid's life moving forward. He's helped his kid out a lot; that's one of the biggest things for him. Whenever he has money he buys clothes, Pampers, or whatever he can to send down to Atlanta. He's very involved in his son's life, and his son is one of the reasons he wants to get out as quickly as possible.

Exhibit G.

In determining an appropriate sentence for Mr. Turner, the Court is primarily guided by the parsimony clause of 18 U.S.C. § 3553(a) and must fashion a sentence sufficient but not greater than necessary to comply with the statutory goals of sentencing. United States v. Douglas, 713 F.3d 694 (2d Cir. 2013). Here, that obligation compels the Court to look beyond Mr. Turner's prior record, particularly given his young age, and impose a sentence that will put Mr. Turner in the best position possible to take advantage of the resources and assistance afforded him through post-release supervision.

The Court's sentence must also reflect the extraordinarily harsh and unforgiving realities of being detained at MDC over the course of the fall and winter of 2021 and beginning of 2022, in which the facility was experiencing intermittent COVID-related lockdowns and other interruptions in medical care and programming—circumstances exacerbated by Mr. Turner's arbitrary and capricious six-month-long placement in the SHU. Indeed, courts in this district routinely vary downward and give significant weight at sentencing to a defendant's pre-trial confinement conditions. Courts in this district routinely take harsh conditions of confinement into account under § 3553(a). See, e.g., United States v. Ozols, 16 Cr. 692 (JMF) (giving defendant credit at sentencing for what he endured at the MDC during an eight-day blackout); United States v. Serrano, 18 Cr. 393 (LAK) (same). And since the COVID-19 pandemic, judges have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities as a result. See, e.g., United States v. Morgan, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during

10

the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); United States v. Casillas, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); United States v. Pierson, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 (same for defendant detained at MDC). See also, e.g., United States v. Jervis Cerino, 19 Cr. 323 (JSR) (S.D.N.Y. July 21, 2020) (granting a variance from a Guidelines range of 57 to 71 months for a Hobbs Act robbery and imposing a sentence of 10 months, noting: "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons"). The same logic applies to Mr. Turner and weighs against a substantial, additional period of imprisonment.

For these reasons, and for any that are apparent at his sentencing hearing, the Court should sentence Mr. Turner to a period of time-served, essentially 20 months, followed by three years' supervised release.

Respectfully Submitted,

Andrew J. Dalack, Esq.
Assistant Federal Defender
(646) 315-1527

Cc:  AUSA Brandon Harper

11